UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
GORDON A. LENZ and JAY
EDMOND RUSS,

                        Plaintiffs,                    MEMORANDUM & ORDER
                                                       08-CV-3795 (TCP) (AKT)
        -against-

AARON YOUNG and SAINT
ANNES DEVELOPMENT
COMPANY, LLC,

                        Defendants.
--------------------------------------------X

PLATT, District Judge.

        Pending is Defendants' Motion for Summary Judgment under Federal Rule of Civil

Procedure 56(b). For the reasons discussed below, Defendants' motion is **GRANTED**.

## BACKGROUND

### A. Facts

        This action is related to other actions, the facts of which help elucidate the facts behind this

action. Therefore, the allegations of the related-cases are detailed herein.[1]

#### a. Related Allegations

        On November 8, 2000, non-party AP Links, LLC ("AP Links") executed a Consulting

Agreement with Global Golf, Inc. ("Global Golf"), a golf course management business owned

and run by Neal Trabich. 09-CV-5437, Pls.' Compl. ¶¶ 7-8.[2] Pursuant to the agreement, Global

Golf would "make use of the service and expertise of [AP Links] with respect to . . . the

development, management and operation of golf courses and/or related activities." *Id.* at ¶¶ 9, 12.

---

[1] As stated *infra*, Neal Trabich pled guilty to crimes relating to these events. Any wrongdoing inferred onto Plaintiffs is alleged and only stated hereto to clarify the underlying facts of this suit.
[2] All citations in the "Related Allegations" subsection derive from the related case, AP Links, LLC v. Russ, 09-CV-5437.

The agreement was to run from May 15, 2001 through October 2016 and Global Golf was to pay AP Links "$720,000 payable in ninety-six (96) equal monthly installments of $7,500 [with] such installments to be paid on the first day of [May, June, July, August, September, and October] in each year during the term of this Agreement." *Id.* at ¶ 14.   Global Golf made the required payments from 2001 through 2006, but failed to make payments for 2007 "and has declared that it does not intend to make any other payments."[3] *Id.* at ¶¶ 17, 18.

At the time of the agreement's execution, Global Golf managed the driving range, restaurant, and/or pro shop with several New York State-owned golf courses, including Bethpage State Park. *Id.* at ¶ 21. The Bethpage management license held significant value "given that the Bethpage Golf Course is comprised of five golf courses, including the world renowned Black Course[, which] attracts hundreds of thousands of golfers every year and hosted in 2002 and 2009 the United States Open golf championships." *Id.* at ¶ 23.

On May 2, 2006, St. Anne's Development Company, LLC ("St. Anne's") entered into a Facility Agreement with Neal Trabich and his wife, Terry Trabich. *Id.* at ¶ 24. As part of the Facility Agreement, the Trabiches requested that St. Anne's arrange, with a third-party lender, a revolving-credit loan that would enable the Trabiches to borrow up to $1,000,000. *Id.* The borrowed money was intended, exclusively, to finance the construction of a golf course and 30,000-foot clubhouse in Middletown, Delaware for St. Anne's. *Id.* at ¶ 25. As security for the loan, Terry Trabich executed a mortgage on the Trabiches' home in Laurel Hollow, New York, which would be enforceable upon the lesser of $1 million or the amount owed to the lender. *Id.* at ¶ 29. St. Anne's agreed not to record the mortgage, except in the event of default, and the Trabiches agreed not to secure any further obligations against the home. *Id.*

---

[3] AP Links states that the amount due is $405,000. *Id.* at ¶ 20.

In October 2006, the Trabiches sought the advice of Defendant Jay Edmond Russ ("Russ") on how to break the above-referenced agreements. *Id.* at ¶ 30. At that time, and continuing forward, Russ was the attorney for the Trabiches and their various business entities. *Id.* at ¶ 32. The Trabiches wanted to sell their Bethpage management license; they agreed to pay Russ a finder's fee if he found a buyer. *Id.* at ¶ 33. Russ asked Gordon Lenz, his friend and another legal client, if Lenz wanted to purchase the license.[4] *Id.* at ¶ 34.

Soon thereafter, on November 3, 2006, Global Golf and the Trabiches—represented by Russ and Russ' law firm, Russ & Russ, P.C. ("Russ & Russ")—sued AP Links, St. Anne's, and their principals, in New York State Supreme Court seeking to void both the Consulting Agreement and the Facility Agreement. *Id.* at ¶ 36. Because the Facility Agreement selected Maryland as the forum for all related suits, all claims against St. Anne's were dismissed by the New York court.[5] *Id.* at ¶ 37. St. Anne's, thereafter, brought a lawsuit against Global Golf and the Trabiches in the United States District Court for the District of Maryland. *Id.* at ¶ 39. That court granted St. Anne's partial summary judgment, finding that the facility agreement was enforceable, and that the Trabiches had breached that agreement. *Id.* St. Anne's was awarded $2,999,792.70. *Id.* St. Anne's, however, has not recovered the award. *See* Defs.' Opp'n Mot. Dismiss 13.

On October 19, 2006, Russ formed Confer Bethpage LLC ("Confer Bethpage") on Lenz's behalf. Pls.' Compl. ¶ 41. On December 21, 2006, Confer Bethpage purchased, via an asset purchase agreement ("APA"), the Bethpage license from Global Golf (and, thus, the Trabiches). *Id.* at ¶ 43. As part of the overall transaction, but not as part of the APA, and on that same day, Lenz loaned $500,000 to Terry Trabich.[6] *Id.* at ¶ 44. The loan was secured by the

---

[4] During the ensuing deal, Russ remained attorney to the Trabiches, Lenz, and their respective entities. *Id.* at ¶ 35.
[5] The claims were then voluntarily dismissed against AP Links. *Id.* at ¶ 38.
[6] The transaction also made Terry Trabich a salaried employee of Confer Bethpage.

Trabich home in Laurel Hollow. *Id.* Russ acted as attorney to all parties in the loan transaction and APA. *Id.* at ¶¶ 45-46. As the attorney, Russ knew that the $500,000 loan from Lenz to Trabich "was part and parcel of the APA between Global Golf and Confer Bethpage." *Id.* at ¶ 47. Russ knew—at minimum due to his counsel in the suit brought in the New York State court, *supra*—the Facility Agreement did not permit Trabich to further encumber the Trabiches' Laurel Hollow home. *Id.* at ¶ 49. The parties did not notify St. Anne's of the mortgage granted to Lenz on that home. *Id.*

Pursuant to the APA, Confer Bethpage paid Global Golf $2.4 million. *Id.* at ¶ 50. Of that price, $400,000 was allocated to inventory and $2,000,000 to goodwill: none of the money was allocated as consideration for the assignment of the Bethpage license. *Id.* Confer Bethpage paid $500,000 at the closing, while, pursuant to four promissory notes, the remainder was due over time. *Id.* at ¶ 52. All monies were to be paid to Russ & Russ, which acted as the escrow agent pursuant to an Escrow Agreement executed in connection with the APA. *Id.* at ¶ 53. The Escrow Agreement granted Russ & Russ "absolute discretion" to determine which of Global Golf's debts would be paid out of the $2.4 million. *Id.* at ¶ 54. Both parties argue Section (2) of the Escrow Agreement is determinative. That section reads:

> The Escrow Funds secure [Global Golf's] obligations pursuant to the [APA], including, but not limited to, [Global Golf's] obligation to deliver clear title to the assets. Escrow Agent shall apply the Escrow Funds to the debts and liabilities of Seller, as Escrow Agent shall determine, in its sole judgment, is necessary or desirable in furtherance of Seller's obligations. Thereafter, the Escrow Agent may release any excess Escrow Funds to Seller, its designee, upon five (5) days advance written notice to Purchaser.

*See, e.g.*, Pls.' Compl. ¶ 54; *see also* Defs.' Mem. Supp. Mot. Dismiss 14. Russ, personally, made all decisions as to the escrow. Pls.' Compl. ¶ 55.

On January 25, 2007, Russ paid his firm $250,000 out of the escrowed funds – funds that were supposed to be paid to Global Golf's creditors. *Id.* at ¶ 56. Although this payment was

4

labeled as legal fees, the fee was, instead, Russ' finder's fee. *Id.* Thereafter, Lenz paid Russ, and his firm, for legal services related to the APA. *Id.* at ¶ 57. Russ, therefore, acted not only as an attorney, but also as a broker; he "was motivated at least in part by the prospect of earning a finders' fee . . . ." *Id.* at ¶ 60.

### b.  Facts

The following facts are drawn from the record and are construed in a light most favorable to Plaintiff.

Defendants and AP Links initiated several lawsuits against Neal Trabich and Plaintiffs for the allegations detailed *supra. See, e.g.*, Pls.' Compl., Ex. 2 at 1. Defendants' filed suit— brought against the Trabiches and the Trabiches' business partners, Ronald and Terry Coruzzi— on April 4, 2007 in the United States District Court for the District of Maryland. The suit alleged "claims sounding in breach of contract and fraud." Defs.' Stmt. Supp. Mot. Summ. J. ¶ 48. On April 18, 2008, AP Links amended its own lawsuit—brought in the same Maryland federal court against Global Golf and Trabich—to include Plaintiffs. *Id.* at ¶¶ 55, 57-58. On April 29, 2008, St. Anne's filed a related-action in this Court against Lenz (08-CV-1730). *Id.* at ¶ 59. This action states Russ was Lenz's attorney and took part in the underlying "scheme." *See* 08-cv-1730, Pl.'s Compl. 6, ECF No. 1. On May 21, 2008, Maryland Federal District Judge William Quarles granted partial summary judgment as to Defendants' breach of contract claim. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 60.

On December 11, 2007, Newsday, the New York daily newspaper, ran a story "reporting that Trabich was charged with three counts of filing a false instrument . . . in connection with Global Golf's . . . contract [with] Suffolk County's Bergen Point Golf Course. *Id.* at ¶ 50. On May 23, 2008, the Maryland Daily Record published an article regarding the partial summary judgment award and the false instrument charges, both noted *supra. Id.* at ¶¶ 62, 63. The article

also noted the two other lawsuits pending in the Maryland federal court, one of which was, as noted *supra*, introduced by Defendants. *Id.* at ¶ 64.

In August 2008, Trabich pled guilty to criminal charges for activities related to these allegations.[7] *See, e.g.*, Pls.' Compl., Ex. 1 at 1.  On August 12 and August 13, 2008, Newsday published a total of four stories regarding the Trabiches. *Id.* at ¶¶ 70-75.

On August 13, 2008, Defendants amended their complaint against Lenz to allege that Trabich, Lenz, and Russ "devised a scheme designed to extricate [Trabich] from . . . the lawful obligations he voluntarily undertook to [St. Anne's]. *Id.* at ¶ 78.  The amendment alleged those three parties "schemed to circumvent" New York General Municipal Law § 109, which "prohibits the assignment of a contract such as [Trabich's Bethpage contract] . . . unless approved by the State of New York." *Id.*  On the same day, Newsday published a story focusing on this case's related lawsuits; it also references, briefly, Trabich's criminal guilty plea. *See* Defs.' Stmt. Supp. Mot. Summ. J., Ex. 39. At the end of the story, in a section entitled "Was deal concealed?", Newsday quoted Kenneth Novikoff—attorney to St. Anne's and related non-party, AP Links—as "argu[ing] the deal was 'concealed' from the state. 'We are confident that when we get discovery . . . we'll get the true picture of what the relationship was between Mr. Lenz and Mr. Trabich.' " Elizabeth Moore, *A deal to sidestep debtors?*, NEWSDAY, Aug. 14, 2008, at A18.

On August 17, 2008, Defendants "filed a Motion to Compel the deposition testimony of Neal Trabich in [Defendants' Maryland suit] because of Trabich's refusal to answer certain questions at a deposition." Defs.' Stmt. Supp. Mot. Summ. J. ¶ 85. In this motion, Defendants "set forth in detail their theory that Trabich and Lenz, through their mutual counsel, Jay Russ,

---

[7] Trabich pled guilty to bribing a Suffolk County legislator to support his bid to win a contract to operate Long Island's Northport Veterans Administration golf course, forging financial documents, and filing false equipment bills. *See, e.g.*, Pl.'s Compl., Ex. 1 at 1.

schemed to unwind the [above-referenced agreements] and to put assets out of the reach of St. Anne's and other creditors of Trabich." *Id.* at ¶ 86. The motion included "Trabich's deposition testimony that Russ, as an attorney for both Trabich and Lenz, acted as a conduit for Trabich and Lenz . . . ." *Id.* at ¶ 87.

On August 20, 2008, the Maryland Daily Record published a story relating to Trabich's guilty plea and Young's related civil cases. Brendan Kearney, MD. DAILY RECORD, Aug. 21, 2008, at 11A. As to Defendants' related civil cases, and Trabich's criminal guilty plea, Young said, as reported by the paper, "Trabich 'is just the first domino to fall.' " *Id.* The paper noted additionally that Young said "actions against the other members of what he calls 'the triumvirate' [Plaintiffs] . . . will come in the next few months." *Id.* The newspaper quoted, and summarized, Young further: " 'We are vigorously pursuing Gordon Lenz and we will soon commence vigorously pursuing Jay Russ,' said Young, who has alleged the men conspired to put Trabich's assets out of Young's reach. 'I think you are going to see a lot more litigation and I think the nefarious nature of this scheme will continue to unravel.' " *Id.*

## B. Causes-of-action

Plaintiffs present two causes-of-action. First, Defendants' comments regarding Mr. Lenz were "false, slanderous and defamatory and, to the extent that they falsely accused Mr. Lenz of criminal conduct, they are libelous *per se* and/or slanderous *per se*." Pls. Compl. ¶ 15.

Second, Defendants' comments regarding Mr. Russ were "false, slanderous and defamatory and, to the extent that they accused Mr. Russ of criminal conduct, they are libelous *per se*." Pls. Compl. ¶ 15.

These claims are brought in this Court pursuant to 28 U.S.C. § 1332(a)(1) under, presumably, New York State law.

## C. Defendants' Motion

Defendants argue they are entitled to judgment as a matter of law because (1) "the statements . . . are not, as a matter of law, defamatory," (2) "the statements at issue are expressions of opinion and argument, and not capable of being proven true or false," and (3) "the statements are privileged under New York statutory law." Defs.' Mem. Supp. Mot. Summ. J. 9.

### DISCUSSION

## A. Standard for Summary Judgment

A motion for summary judgment may not be granted unless the Court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "Summary judgment may be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.' " *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). The Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir. 1998).

"A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). "[T]he judge's function [in reviewing a motion for summary judgment] is not to

8

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

The Supreme Court has held that, when opposing parties' versions of events differ substantially, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' " *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B.    Defamation**

**a.  Standard**

"Defamation has long been recognized to arise from the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Dillon v. City of New York,* 704 N.Y.S.2d 1, 5 (N.Y. App. Div. 1999) (citing *Foster v. Churchill,* 665 N.E.2d 153, 157 (N.Y. 1996)).

"A claim of defamation requires proof that the defendant made a false statement, published that statement to a third party without privilege, with fault measured by at least a negligence standard, and the statement caused special damages or constituted defamation per se." *Dickson v. Slezak,* 902 N.Y.S.2d 206, 208 (N.Y. App. Div. 2008) (citing *Roche v. Claverack Coop. Ins. Co.,* 874 N.Y.S.2d 592, 596 (N.Y. App. Div. 2009); *Dillon,* 704 N.Y.S.2d at 5) (internal quotations omitted).

> The dispositive inquiry, under either Federal or New York law, is whether a reasonable reader could have concluded that the articles were conveying facts about the plaintiff. Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action. In our

State the inquiry, which must be made by the court, entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. New York Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) (internal citations and quotations omitted). The third prong of this inquiry includes a regard for the "particular forum" of the speech. *See Kim v. Dvorak*, 658 N.Y.S.2d 502, 505 (N.Y. App. Div. 1997) (". . . [the court] find[s] it clear, 'tak[ing] into consideration the larger context in which the statements were published, including the nature of the particular forum . . . .") (citing *Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995)).

If one is found to be conveying facts, the statements are actionable because "a reasonable . . . reader would infer that the speaker . . . knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed . . . ." *Gross*, 623 N.E.2d at 1165. "In contrast, [conveying opinion is] not actionable because . . . [it] is readily understood by the audience as conjecture . . . . Indeed, this class of statements provides a clear illustration of situations in which the full context of the communication signals readers . . . that what is being read . . . is likely to be opinion, not fact." *Id.* (internal citations and quotations omitted).

"In evaluating whether a cause of action for defamation is successfully pleaded, the words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Dillon*, 704 N.Y.S.2d at 5 (citing *Silsdorf v. Levine,* 449 N.E.2d 716, 719 (N.Y. 1983)).

It is a "well-established principle that . . . the court [is] to decide whether the statements complained of are 'reasonably susceptible of a defamatory connotation.' " *Silsdorf*, 449 N.E.2d at 719. " 'Courts will not strain' to find defamation 'where none exists.' " *Dillon*, 704 N.Y.S.2d at 5 (quoting *Cohn v. National Broadcasting Co.*, 408 N.E.2d 672, 673 (N.Y. 1980)). "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Id.* (*Gross*, 623 N.E.2d at 1167; *Immuno A.G. v. Moor-Jankowski*, 567 N.E.2d 1270, 1274 (N.Y. 1991)).

### b. Analysis

#### i. Maryland Daily Record

Reading the publication as a whole, the Court finds no reasonable reader could have understood Young's statement to be actionable. The newspaper's headline reads "Golf investor presses to speed up Md. Case." Kearney, *supra* 7. The sub-headline is "Urgency comes after course developer pleads guilty to bribery in NY." *Id.* The newspaper quotes Young in the seventh and eighth paragraphs. *Id.* While the first paragraph deals with Trabich's criminal plea, the next five paragraphs discuss the civil cases in which Young is involved. These paragraphs mention the criminal plea, but only in the context used in the headline and sub-headline: Young wanted to speed up his civil cases because the criminal plea, and the related prison sentence, might harm Young's ability to potentially win, and collect from, the civil cases against Trabich. *See, e.g.*, Letter to Judge Quarles from Steven Gould 3, WDQ-07-1056, Aug. 20, 2008 ("Since . . . . Mr. Trabich['s guilty plea] . . . matters such as these have taken on an unanticipated urgency. It appears Mr. Trabich will soon be incarcerated. If Mr. Trabich is to submit [to] further deposition . . . then [the deposition] should occur before his prison term commences.").

Young's comments in the eighth paragraph specifically state that he is undertaking civil litigation against Plaintiffs. Kearney, *supra* 7 ("We are vigorously pursuing [Lenz] and we will

soon . . . [pursue] Russ."). Read in relation to these comments, a reasonable reader would conclude that Young's quotes in the previous paragraph ("first domino to fall" and "the triumvirate") relate to the civil litigation he had brought, or was in the process of bringing, against the three. Indeed, the seventh paragraph relates entirely, and explicitly, to the civil actions. Neither the article in whole nor Young's quotes suggest Plaintiffs played any part in the criminal activity for which Trabich pled guilty.

Young's comments do not reach even the level of hyperbole. Young's lawsuits allege Trabich and Plaintiffs acted together to commit various improprieties; in that way, Young's use of "triumvirate" is nothing more than a litigant using a term that connotes three parties working together.[8] Indeed, in the following paragraph, the newspaper states that Young "has alleged the men *conspired* to put Trabich's assets out of Young's reach." *Id.* (emphasis added). To conspire is "to act in harmony toward a common end." MERRIAM-WEBSTER DICTIONARY. Read in whole, Young's use of "triumvirate" connoted the alleged three-person conspiracy to harm Young's interest; in other words, the basis of his lawsuit against Trabich and Plaintiffs.

Under New York's "contextual analysis" standard, the Court is to "look 'at the content of the whole communication, it tone and apparent purpose' " and to "avoid 'the fine parsing . . . [required by] Federal law.' " *115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 938 (N.Y. 1992) (citing *Immuno AG. v. Moor-Jankowski,* 567 N.E.2d 1270, 1278). Young's quotes in the Maryland Daily Record clearly relate to the civil litigation he was pursuing against the three parties. In the context of the whole article, this Court "will not strain to find defamation where none exists." *Dillon*, 704 N.Y.S.2d at 5. The Court, therefore, grants Defendants' motion as to Young's comments.

---

[8] One of the definitions in the Merriam-Webster Dictionary defines triumvirate as "a group or association of three."

### ii. Newsday

#### 1. Russ

Whether or not Novikoff meant to include Russ in his comments, no finder of fact could hold that Novikoff defamed Russ. Novikoff did not make any statements about Russ, nor is there any indication from the article, nor the section of the article regarding concealment, that Russ was involved in any concealment. In the article, Russ is only mentioned as having sent a letter to the State regarding Trabich retaining his position at Bethpage (and in an earlier sentence merely as being Trabich's attorney). Nowhere in the article does the newspaper or Novikoff state or imply, as fact or opinion, that Russ was part of the concealment. Novikoff does not mention, nevermind defame, Russ. The court grants Defendants' motion as to Young in Count Two of the Complaint.

#### 2. Lenz

Novikoff's statement does not rise to an actionable offense. The newspaper states Novikoff "argues" the parties concealed the deal. Moore, *supra* 6. Novikoff could have meant this quote as a fact, not an argument, but it does not matter: the only term that matters is "argues" and how it affected the reader's understanding of the events. In this case, a lawyer arguing is a lawyer presenting his client's case. It is not a recitation of facts, but a spirited advocacy in furtherance of his client's case. *See, e.g., Gross*, 623 N.E.2d at 1165 ("[conveying opinion is] not actionable because . . . [it] is readily understood by the audience as conjecture.").

Like the facts stated in *Gross*, the audience would understand that Novikoff's statement was conjecture because, in the article's following sentence, Novikoff states the discovery process would enable all to see "the true picture of . . . the relationship" between Lenz and Trabich. Moore, *supra* 6. As noted, *supra*, under *Gross*, a statement is actionable because "a reasonable . . . reader would infer that the speaker . . . knows certain facts, unknown to the audience, which

13

support the opinion and are detrimental to the person toward whom the communication is directed . . . ." *Gross*, 623 N.E.2d at 1165. The opposite is described in the article: Novikoff is explicitly stating that he does *not* know certain facts, which were, of course, also unknown to the reader. The facts would only become know after discovery. Novikoff's quote "was statement of opinion and advocacy and not a presentation alleging objective fact." *115th St. Corp. v. Von Gutfeld*, 603 N.E.2d at 938. The Court, therefore, grants Defendants' motion as to Novikoff in Count One.

### CONCLUSION

The Court does not see any evidence, and certainly not sufficient evidence, that Defendants' statements are "reasonably susceptible of a defamatory connotation." *Silsdorf*, 449 N.E.2d at 719. Therefore, Defendants' motion for summary judgment is **GRANTED**.

**SO ORDERED.**

Dated: May _3_, 2011
       Central Islip, New York

Thomas C. Platt, U.S.D.J.

14